1

2          FILED'10 MAR 02 13:41USDC-ORP

3

4

5

6

7              IN THE UNITED STATES DISTRICT COURT

8                 FOR THE DISTRICT OF OREGON

9

10   RHONDA ARNOTH,                    )
                                       )
11              Plaintiff,             )   Case No. CV 09-241-HU
                                       )
12        v.                           )
                                       )     OPINION AND
13   DHL EXPRESS (U.S.A.), INC.,       )       ORDER
                                       )
14              Defendant.             )
     ──────────────────────────────── )

15   Katelyn S. Oldham
16   Oldham Law Office
     620 S.W. Sixth Avenue
17   Portland, Oregon 97205
          Attorney for plaintiff
18
     Richard R. Meneghello
19   Laura P. Jordan
     Fisher & Phillips
20   111 S.W. Fifth Avenue, Suite 1250
     Portland, Oregon 97204
21        Attorneys for defendant

22   HUBEL, Magistrate Judge:

23        This is an action by Rhonda Arnoth against DHL Express U.S.A.,

24   Inc. (DHL), asserting claims for injured worker discrimination and

25   failure to reinstate, in violation of Or. Rev. Stat. §§ 659A.040,

26   659A.043,   and   659A.046;   and   for   disparate   treatment   sex

27

28   OPINION AND ORDER Page 1

discrimination under Or. Rev. Stat. 659A.030 (a) and (b). She seeks damages for past and future lost wages and benefits; compensatory damages for emotional distress; and reinstatement to her former position or a comparable one.

Arnoth worked for DHL in the Portland station as a Field Service Supervisor, the only female in that position at the time of her termination. On December 20, 2007, Arnoth filed a worker's compensation claim, which DHL accepted on February 19, 2008. On February 14, 2008, she was released to return to modified work duty, but DHL terminated her on February 13, 2008, as part of a reduction in force (RIF). Arnoth alleges that she had more seniority than other Field Service Supervisors in Portland who were not laid off, and that none of the male Field Service Supervisors at the Portland station lost his job when she did.

DHL moves for summary judgment on all claims.

### Factual Background

Arnoth was hired at the Portland station in May 2006. She was one of six Field Services Supervisors at the Portland station, the only female in that position. Two of the Field Services Supervisors were hired before Arnoth, and three were hired after she was. Declaration of Stephen Quimby ¶ 4; Declaration of Katelyn Oldham, ¶ 8, Exhibits 6 and 7. Arnoth reported to District Field Services Manager (DFSM) Ardeen Porter. Declaration of Laura Jordan Exhibit 1 (Pltf. dep.) 75:23-76:8. During Arnoth's employment, the Portland station operated Monday through Saturday. Quimby Declaration ¶ 5. There were three supervisor shifts on weekdays: an opening shift,

OPINION AND ORDER Page 2

1  a midday shift, and a closing shift.  Id. During weekday shifts,
2  each supervisor was responsible for supervising particular aspects
3  of the operation, including the inbound and outbound sort, the
4  ramp, the drivers, and the agents. Id. Supervisors were also
5  expected to fill in as needed, depending on the needs of the
6  station. Id.

7      The Saturday shift had only one shift with one supervisor,
8  because fewer employees worked on Saturdays and fewer packages
9  moved through the facility, compared to weekdays. Pltf. dep. 80:7-
10 13; 81:2-4. The supervisor assigned to the Saturday shift worked
11 Tuesday through Saturday, while the other supervisors worked Monday
12 through Friday. Quimby Declaration ¶ 6. Supervisors' pay did not
13 vary on the basis of their shifts, nor did assignment to the
14 Saturday shift affect a supervisor's opportunities for advancement
15 within the company. Quimby Declaration ¶ 6. However, Arnoth asserts
16 that the Saturday supervisor job was less desirable because the
17 Saturday supervisor operated alone, had no support, and did not
18 interact with other supervisors or the DFSM. Quimby Declaration ¶
19 6; Pltf. dep. 8:18-9:9; 160:12-14.

20      The duties of Field Services Supervisors changed depending on
21 the needs of the station. At various times, Arnoth was in charge of
22 inbound operations, outbound operations, check ride supervision,
23 and supervision of the Saturday shift. Quimby Declaration  ¶ 5;
24 pltfs. dep. 70:10-17; 79:20-80:6.

25     In July 2007 Porter transferred to another station.
26 Declaration of David Grudin ¶ 4. In late September or October 2007,
27
28 OPINION AND ORDER Page 3

Stephen Quimby became the new DFSM for the Portland station. Quimby Declaration ¶ 2; pltfs. dep. 77:25-78:3. During the interval between Porter's transfer and Quimby's arrival, station manager Chris Rooney supervised the Field Services Supervisors. Pltfs. dep. 77:25-78:3.

Rooney assigned Arnoth to the Saturday shift, telling her he needed someone with her experience for that shift. Pltfs. dep. 11:24-12:1; 12:14-19. Arnoth has testified that "past practice" dictated that the least senior supervisor assume Saturday shift duties. Id. at 13:22-14:3. During Arnoth's tenure at DHL, the Saturday shift position was occupied by Arnoth, two other women, and one man. Pltf. dep. 14:4-18:6.

Quimby supervised Arnoth for approximately three months, October, November, and December 2007 prior to her injury on December 20, 2007. When Quimby became DFSM, he did not change the schedules of the Field Services Supervisors. Quimby Declaration ¶7. Accordingly, Arnoth continued to work Tuesday through Saturday. Id.

Arnoth has testified that in October 2007, Quimby assigned her to dispatch duties, which "made for 12 hour days." Pltf. dep. 10:14-24. According to Arnoth, Quimby's stated reason for assigning her to dispatch was to cover for the regular dispatcher while she was out on maternity leave. Arnoth Declaration ¶ 4. Arnoth states that she believes other administrative staff could have performed these duties, and that by the time of her injury, December 20, 2007, and even by the time of her termination in February 2007, the regular dispatcher had still not gone on maternity leave. Id.

OPINION AND ORDER Page 4

1  Arnoth states that none of the male supervisors was assigned to
2  dispatch. Id.  Arnoth also states that to her knowledge, none of
3  the male supervisors was required to dispatch on Monday, her day
4  off. Id.

5     Arnoth has testified that in October 2007, Quimby yelled at
6  her in front of staff, see Arnoth Declaration ¶ 7,[1] and during
7  supervisors' meetings, and that he began to exclude her from
8  supervisors' meetings, the frequency of which declined from weekly
9  to "maybe once a month." Id. 23:15-21; 26:1-8.[2] However, Arnoth
10 made no complaints to management about Quimby's treatment of her.
11 Quimby Declaration ¶ 8; Grudin declaration ¶ 5.

12    Arnoth states in her declaration that when she was assigned
13 dispatch duties, she told Quimby it would be difficult to reconcile
14 dispatching with her other job duties requiring that she be in the
15 field for periods of three to eight hours at a time.   Arnoth
16 Declaration ¶ 5. Arnoth states that other supervisors were not
17 required to spend as much time in the field, and could more easily
18 have handled dispatching. Id. Quimby refused her request to assign
19 some of her duties to other supervisors. Id.

20    In November 2007, DHL announced elimination of its domestic
21 express service and ground services, which were phased out in 2008

22
23    [1] Arnoth also states in her declaration that she saw Quimby
    yell at Porter during a meeting, and that drivers frequently
24 complained to her about Quimby's "communication style." Id. at ¶
    7.

25
26    [2] Arnoth has testified that meetings usually occurred once a
    week, but that they were held only about once a month during
27 DHL's busy season, November and December. Pltf. dep. 26:4-8;
    50:7-9.

28 OPINION AND ORDER Page 5

1  and discontinued entirely by January 2009. Declaration of Kelly
2  Aguilar ¶¶ 3, 4.

3      On December 15, 2007, Arnoth was given an oral warning for
4  failure to ensure delivery of Saturday Nordstrom shipments in
5  October 2007 and December 2007. The warning was documented as a
6  "Corrective Action." Quimby Declaration ¶ 10, Exhibit 3; Oldham
7  Declaration, Exhibit 3. Arnoth has testified that Quimby did not
8  discipline male supervisors who were responsible for failed
9  Nordstrom deliveries. Pltf. dep. 24:22-25:25.

10     On December 20, 2007, Arnoth injured her hip and wrist when
11 she tripped and fell over a box at work. Pltf. dep. 36:16-37:16;
12 38:2. She sought medical treatment the following day and was taken
13 off work for right wrist strain and contusion of the right hip, see
14 Mantilla Declaration, Exhibit 1, because Arnoth's commute was long
15 enough to cause her leg to go numb. Pltf's dep. 39:3-6, 16-24;
16 43:7-13. Arnoth was off work on medical leave from December 21,
17 2007 to February 14, 2008. Declaration of Lucia Mantilla ¶ 4,
18 Exhibit 2.

19     Mantilla states that based on her experience as a claims
20 specialist, she thought Arnoth's claim involved a relatively light
21 incident that should not have resulted in such an extended period
22 of time off work. Id. She states further that orthopedic guidelines
23 for treatment of injuries such as Arnoth's contemplate that the
24 patient will be medically stationary within 30 days of the injury.
25 Id. See also Exhibit 3, p. 7 (opinion of neurosurgeon Paul Williams
26 that "[t]reatment or four weeks after the injury is appropriate,
27

28 OPINION AND ORDER Page 6

1  reasonable, and necessary for a right wrist strain and a contusion
2  of the right hip and leg"). Mantilla investigated Arnoth's claim,
3  including arranging for an independent medical examination (IME),
4  a procedure Mantilla ordered in the majority of the claims she
5  handled for DHL. Id.

6      The physician who performed the IME, Paul Williams, M.D.,
7  concluded that Arnoth was medically stationary and immediately
8  capable of performing her job without restriction as of the date of
9  her examination, January 29, 2008. Id. at ¶ 6. Mantilla states that
10 she sent Dr. Williams's report to Arnoth's attending physician, who
11 concurred with Dr. Williams, but did not send in the concurrence
12 until March 7, 2008. Id. at Exhibit 3.

13     After receiving the attending physician's concurrence,
14 Mantilla proceeded to close Arnoth's worker's compensation claim.
15 Id. at ¶ 7. On March 11, 2008, Mantilla mailed Arnoth a notice of
16 claim closure via certified mail, which confirmed that Arnoth was
17 released to work with no restrictions. Id.; Exhibit 4.

18     Meanwhile, in January 2008, David Grudin in HR received word
19 from the corporate office that DHL was beginning the process of
20 making significant labor reductions, with the first round of
21 layoffs to occur on February 12 and 13, 2008. Grudin Declaration ¶
22 6. The decision about how many employees would be laid off from
23 each station, and what type of employee, was made on a corporate
24 level outside Portland, not at the station level. Id. The corporate
25 directive required the Portland station to eliminate one Field
26 Services Supervisor. Id. Grudin states that as part of the process,
27
28 OPINION AND ORDER Page 7

1  he was provided with characteristics to be assessed in determining

2  which employees would be selected for the first round of layoffs.

3  Id.

4      Grudin worked with regional managers and District Field

5  Services managers, including Quimby from the Portland station, to

6  obtain information about the employees, which included categories

7  of past performance, current performance, critical skills, and

8  competencies. Id. at ¶ 7. Critical skills that were assessed

9  included an employee's leadership abilities, job knowledge, and

10  ability to achieve service goals and maintain productivity

11  standards. Id. Competencies that were assessed included, among

12  other things, an employee's skills and abilities in the areas of

13  communication, organization, and management. Id. Seniority was not

14  a consideration. Id.    The scoring criteria were primarily

15  subjective, with employees being rated on a scale of zero to three.

16  Oldham Declaration, Exhibit 9.

17      Quimby rated his subordinates and gave his ratings to Grudin.

18  Quimby Declaration ¶ 12. Quimby gave Arnoth the lowest rating among

19  the Field Services Supervisors. Id.[3] Grudin entered data from

20  Quimby onto a spreadsheet, which generated an overall rating for

21  each employee. Grudin Declaration ¶ 8. Out of a possible 21 total

22  points, Arnoth was given eight points. All of the male Field

23  Services Supervisors were ranked higher, with four receiving 11 out

24

25      [3] Arnoth's 2006 Performance Evaluation, completed by Porter

26  and signed by Arnoth in March 2007, gives her an overall
   performance rating of "fully meets," but with scores in some

27  areas of "partially meets." Jordan Declaration, Exhibit 3, p. 2.

28  OPINION AND ORDER Page 8

1  of 21 points, and another receiving 13 points. Id.

2      The first round of layoffs was February 12-13, 2008. According

3  to Grudin's Declaration, during this first round, approximately 25

4  supervisors and managers in DHL's western area were laid off,

5  including 19 male supervisors and managers, six of whom were male

6  Field Services Supervisors. Id. at ¶ 10. On February, 13, 2008,

7  Quimby and Grudin called Arnoth to inform her that her position was

8  being eliminated. It is not disputed that Arnoth was the only Field

9  Services Supervisor at the Portland station laid off in this round.

10 Arnoth received three weeks of severance pay, based on her length

11 of service (two years) with DHL. Id.  According to Quimby, in

12 subsequent rounds of layoffs, three more Field Services Supervisors

13 lost their jobs at the Portland station: Ryan Cook, laid off in

14 October 2008, Corey Hester, laid off in February 2009, and Trent

15 Larsen, laid off in March 2009. Quimby states that when he left DHL

16 in March 2009, only two Field Services Supervisors remained at the

17 Portland station.  Quimby Declaration ¶ 13. The number of employees

18 at the Portland station eventually declined from 114 on January 1,

19 2006, to 33 as of November 2009. Aguilar Declaration ¶ 4.

20                          **Discussion**

21     1.   Sex discrimination disparate treatment claim

22          a.   Prima facie case

23     A prima facie case of disparate treatment under Oregon's

24 discrimination statutes is the same as that for Title VII.

25 Henderson v. Jantzen, 79 Or. App. 654, 657 (1986). The prima facie

26 elements of the disparate treatment case are, first, that plaintiff

27

28 OPINION AND ORDER Page 9

is a member of a protected class; second, that she was meeting the employer's legitimate expectations; third, that she experienced an adverse employment action; and fourth, that similarly situated individuals outside her protected class were treated more favorably, or other circumstances surrounding the adverse action give rise to an inference of discrimination. <u>Godwin v. Hunt Wesson, Inc.</u>, 150 F.3d 1217, 1220 (9th Cir. 1998). DHL asserts that Arnoth has not shown that she experienced an adverse employment action or that similarly situated males were treated more favorably.

In the context of a discrimination claim, adverse employment action is construed more narrowly than in the context of a retaliation claim, and is limited to "actions that affect employment or alter the conditions of the workplace." <u>Burlington N. & Santa Fe Rwy. Co. v. White</u>, 126 S.Ct. 2405, 2411 (2006); <u>Kang v. U. Lim Am., Inc.</u>, 296 F.3d 810, 818-19 (9th Cir. 2002). DHL asserts that none of the circumstances complained of by Arnoth constituted an adverse employment action.

The areas in which Arnoth asserts she was treated differently from the male Field Services Supervisors are 1) exclusion from supervisory meetings; 2) assignment to dispatch duties; 3) being given no assistance with the safety manager aspects of her job; 4) continual assignment to the Saturday shift; 5) being disciplined for minor issues when other male supervisors were not disciplined for more serious issues; 6) receiving a lower rating than male comparators who were less experienced and or had more performance deficiencies; and 7) being selected for termination based on that

OPINION AND ORDER Page 10

lower rating.

Arnoth asserts that shortly after Quimby arrived, he began excluding her from supervisory meetings, on the ground that he wanted her to dispatch. Arnoth Declaration ¶ 3. Arnoth states that Quimby's exclusion of her from supervisory meetings was detrimental to her ability to perform her job because crucial information was exchanged, and the meetings provided an opportunity to speak with and listen to peers and upper level management. Arnoth Declaration ¶¶ 2-3. DHL challenges this testimony, pointing out that Arnoth acknowledges supervisors' meetings were held only about once a month during the busy season, between November and January. Arnoth Declaration ¶ 2. Thus, for two of the three months Quimby supervised Arnoth (November and December), meetings occurred only once a month. DHL also points to the absence of evidence that Arnoth's absence from the meetings had any effect on her pay, benefits, or opportunities for advancement. Quimby Declaration ¶ 6.

With respect to the assignment of dispatch duties, Arnoth contends that dispatch could have been performed by another nonsupervisory employee. Quimby's stated reason for assigning dispatch to Arnoth was that the regular dispatcher was expected to be out on scheduled maternity leave, but Arnoth states that the dispatcher had still not taken her leave when Arnoth was injured in December 2007. Arnoth also asserts that on Mondays, her day off, Quimby did not assign any of the male supervisors to dispatch. Arnoth has stated that dispatch was a hardship for her, because it conflicted with other job duties requiring her to be out in the

OPINION AND ORDER Page 11

1  field, and "made for 12 hour days."

2      DHL counters that Arnoth has produced no evidence that the
3  dispatch assignment affected the terms and conditions of her
4  employment including pay, benefits, or opportunities for
5  advancement, nor any evidence that Arnoth's pay was docked or that
6  she was disciplined for not being in the field. DHL also points to
7  evidence from Quimby that Field Services Supervisors typically
8  worked 12 hour days, so Arnoth's statement that dispatch duties
9  "made for 12 hour days" does not distinguish her from her male
10 comparators. Quimby Declaration ¶ 6. Arnoth herself testified that
11 other supervisors worked similarly long days (11 hours). Pltf. dep.
12 9:8-24. I find no evidence in the record that Arnoth worked more
13 hours than any male Field Services Supervisor.

14     Arnoth asserts that Quimby denied her request for assistance
15 with the safety manager aspects of her job. Arnoth Declaration ¶
16 5. Arnoth does not specify what her specific request was. DHL
17 points to evidence that supervisors often asked for assistance with
18 one aspect or another of their jobs. Jordan Reply Declaration
19 Exhibit 2 (Quimby dep.) 73:10-13. Quimby also testified that he
20 supplied Arnoth with contact information for experts within DHL who
21 could assist her, Quimby dep. 72:19-73:3, and that Arnoth
22 participated in a weekly 90-minute conference call facilitated by
23 regional safety manager Kelly Tatum, in which safety supervisors
24 from each station in Ms. Tatum's region would call in to discuss
25 pending worker's compensation claims. Jordan Reply Declaration,
26 Exhibit 3 (Tatum dep.) 41:1-17; 42:6-19. DHL points to the absence

27

28 OPINION AND ORDER Page 12

1  of any evidence that a failure to provide Arnoth assistance with
2  her safety duties adversely affected Arnoth's pay, benefits or
3  opportunities for advancement.

4      Arnoth contends that she was treated unfairly when she
5  requested relief from the Saturday shift. Arnoth states in her
6  declaration that when Porter had been DFSM, she had rotated this
7  shift. Arnoth Declaration ¶ 6. Arnoth states that she told Rooney
8  she would rather not work the Saturday shift so that she could
9  attend her son's sporting events, which typically occurred on
10 Saturdays. Id. In support of her assertion that Saturday shifts
11 constituted treatment unfair to her, she points to evidence that
12 after her termination, the Saturday shift was not reassigned to one
13 of the five remaining male supervisors, but became rotational.
14 Oldham Declaration, Exhibits 23 and 24.

15     DHL challenges Arnoth's assertion that working the Saturday
16 shift was an adverse employment action that required Arnoth to
17 assume additional responsibilities not borne by the other
18 supervisors and affected her opportunity for promotion because her
19 manager was not at work on Saturdays. DHL asserts that it
20 necessarily follows from Arnoth's assertions that assigning *anyone*
21 to the Saturday shift would constitute an adverse employment
22 action. DHL also argues that Arnoth has overlooked her other four
23 workdays, which were weekdays, a difference of only one day in
24 comparison to her male comparators. But DHL's arguments fail to
25 address Arnoth's assertion that the Saturday supervisor shift was
26 not rotated among the other supervisors when she had it.

27

28 OPINION AND ORDER Page 13

1    Arnoth asserts that during her employment she was subjected to
2    yelling and profane language from Quimby, and states that while she
3    does not assert a claim of hostile work environment, Quimby yelled
4    at Arnoth and other women, including Porter, but did not treat male
5    employees the same way. Pltf. dep. 23:15-24:25.   DHL does not
6    dispute this assertion, but counters that yelling does not rise to
7    the level of an adverse employment action. Nunez v. City of Los
8    Angeles, 147 F.3d 867, 875 (9th Cir. 1998)(threats and harsh words
9    insufficient to constitute adverse employment action).

10    Arnoth asserts that she was disciplined by Quimby for conduct
11    that would not have been disciplined when engaged in by male
12    employees.   Arnoth refers to the oral warning she was given about
13    the Nordstrom packages in October and December 2007, and asserts
14    that the first of these errors was caused by a driver's error.
15    Quimby Declaration, Exhibit 1. Arnoth acknowledges that the missed
16    Nordstrom shipment in December was her responsibility, but has
17    testified that there were "issues" with Nordstrom shipments that
18    the Portland station was "working on," and that e-mails from
19    executives throughout the company indicated that DHL and Nordstrom
20    were working together on these "issues." Pltf. dep. 92:12-93:2;
21    158:3-18. DHL asserts that the oral warning is the lowest level of
22    corrective action, see Quimby dep. 71:2-10, and did not constitute
23    an adverse employment action.

24    When the evidence pertaining to Arnoth's assignment to
25    dispatch duties and the Saturday shift on a non-rotational basis,
26    Quimby's yelling at her, her exclusion from meetings apparently in
27
28    OPINION AND ORDER Page 14

1   part because of being required to do dispatch, and receiving the
2   lowest rating on the RIF matrix, is considered along with the fact
3   that the Field Services Supervisor selected for layoff at the
4   Portland station was its only female Field Services Supervisor,
5   while three males with less experience remained, it is sufficient
6   to satisfy Arnoth's burden of showing that she was treated
7   differently from similarly situated male Field Services
8   Supervisors. Her termination was unquestionably an adverse
9   employment action. I conclude that Arnoth has made out a prima
10  facie case of sex discrimination.

11        b.    Nondiscriminatory explanation

12        DHL can rebut Arnoth's prima facie case by producing a
13  legitimate, nondiscriminatory explanation for Arnoth's termination.
14  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-07 (1993). DHL
15  must produce evidence, not merely express an argument. Rodriguez v.
16  GMC, 904 F.2d 531, 533 (9th Cir. 1990). DHL contends that Arnoth was
17  terminated for a non-discriminatory reason, i.e., the company-wide
18  RIF of which Arnoth was a part. It has produced evidence of the
19  RIF.

20        c.    Pretext

21        DHL has produced a legitimate, nondiscriminatory explanation
22  for Arnoth's termination; the burden shifts back to her to produce
23  evidence that the DHL's proffered nondiscriminatory reason is
24  pretextual. On summary judgment, Arnoth's burden is only to produce
25  enough evidence to allow a reasonable factfinder to conclude that
26  her termination was motivated by discrimination. Peterson v.

27

28  OPINION AND ORDER Page 15

1   Hewlett Packard Co., 358 F.3d 599, 603 (9th Cir. 2004); Warren v.
2   City of Carlsbad, 58 F.3d 439, 443 (9th Cir. 1995). This may be
3   accomplished "either directly by persuading the court that a
4   discriminatory reason more likely motivated the employer or
5   indirectly by showing that the employer's proffered explanation is
6   unworthy of credence." Texas Dep't of Community Affairs v. Burdine,
7   450 U.S. 248, 256 (1981).

8          The mere fact that she was terminated as part of a RIF does
9   not foreclose Arnoth's claims. Circumstantial evidence can show
10  that a supervisor's RIF scores were pretextual, particularly for
11  evaluations in "soft-skill" categories such as "communication/
12  leadership." EEOC v. Boeing Company, 577 F.3d 1044, 1052 (9th Cir.
13  2009). Arnoth's own testimony about why her low scores were wrong,
14  mistaken, or unworthy of credence is also evidence. Id.

15         As discussed, Arnoth has produced evidence that she was
16  treated differently from the male supervisors in several respects,
17  particularly by Quimby. Quimby's ratings of Arnoth, assessed after
18  less than three months as her superior, were almost entirely based
19  on "soft-skill" categories, including the possession of unspecified
20  "unique skills;" "leadership," including "[m]aintain[ing] the
21  "self-confidence and self-esteem of others;" "customer service
22  orientation;" "teamwork and collaboration;" "initiative and
23  adaptability;" and "communication," including "nonverbal
24  communication." These qualities were rated on a scale defined by
25  other soft criteria, such as "less than fully competent in some or
26  most skills and abilities," (zero) and "currently less than fully

27

28  OPINION AND ORDER Page 16

1  competent in some skills and abilities [but]... is able to meet
2  most aspects of the job requirements and with additional training
3  and/or experience can meet the expectations of the job" (one). See
4  Oldham Declaration Exhibit 9.

5      Arnoth has produced sufficient evidence to allow a reasonable
6  factfinder to conclude that her termination was motivated by sex
7  discrimination. DHL's motion for summary judgment on this claim is
8  denied.

9      2.    Injured worker discrimination claim

10     A prima facie case of unlawful termination based on injured or
11 status requires the following: 1) that plaintiff invoked the
12 workers compensation system; 2) that she experienced an adverse
13 employment action; and 3) a causal link exists between the two. See
14 Williams v. Freightliner, LLC, 196 Or. App 83, 90 (2004). The
15 McDonnell Douglas framework applies to such claims. Scott v. Sears,
16 Roebuck & Co., 395 F.Supp.2d 961, 981 (D. Or. 2005).

17     To satisfy the causal element, Arnoth must show that
18 invocation of the workers compensation system was a "factor that
19 made a difference" in DHL's decision to terminate her employment.
20 Dickison v. Wal-Mart Stores, Inc., 2007 WL 1959287 *3 (D. Or. July
21 2, 2007). Temporal proximity between the filing of a worker's
22 compensation claim and a subsequent adverse employment action,
23 without more, does not establish the required causal connection
24 between the two events. Hardie v. Legacy Health System, 167 Or.
25 App. 425, 433 (2000); Kotelnikov v. Portland Habilitation Center,
26 545 F. Supp. 2d 1137 (D. Or. 2008).

27

28 OPINION AND ORDER Page 17

1    Arnoth asserts that Mantilla's investigation into her worker's
2  compensation claim is sufficient to demonstrate discriminatory
3  animus.   DHL   counters   with   Mantilla's   testimony   that   she
4  investigated  numerous  claims  in  the  same  manner  as  Arnoth's,
5  ordering an IME in 90% of the claims she handled for DHL. Jordan
6  Reply Declaration, exhibit 4 (Mantilla dep.) 132: 23-25; 133:7-9,
7  13-15. DHL also points out that Arnoth's worker's compensation
8  claim was accepted,  and  closed  only  after  Arnoth's  physician
9  concurred in the opinion of the IME doctor.
10    Arnoth also relies on the timing between her injury and her
11  termination date to create an inference of discrimination. See
12  Coszalter v. City of Salem, 320 F.3d 968, 978 (9th Cir. 2003)
13  (timing  alone  does  not  support  inference  of  discrimination;
14  additional evidence of surrounding circumstances must support such
15  an inference). DHL argues that Arnoth has not produced additional
16  evidence of supporting circumstances that support an inference of
17  discrimination, and that it has produced evidence that neither
18  Quimby,  nor  Grudin  chose  the  layoff  date,  and  that  many  DHL
19  employees, including males, were laid off the same day as Arnoth.
20  I  conclude  that  Arnoth  has  no  evidence  to  support  worker's
21  compensation   discrimination   except   for   timing,   which   is
22  insufficient. DHL is entitled to summary judgment on this claim.
23    3.   Failure to Reinstate or Reemploy
24    Under Oregon law, reinstatement rights do not arise if the
25  employer establishes that the worker was discharged from her pre-
26  injury position for reasons unrelated to the injury or her worker's
27
28  OPINION AND ORDER Page 18

1   compensation claim. <u>Lane County v. State</u>, 104 Or. App. 372, 377

2   (1990); see also OAR 839-006-0131(1)(g), OAR 839-006-0136(7).

3       DHL argues that Arnoth's status as an injured worker did not

4   preclude DHL from considering her for the 2008 layoffs. The

5   regulations implementing Or. Rev. Stat. §659A.043 state that an

6   injured worker has "has no greater right to a position or other

7   employment benefit than if the worker had not been injured." OAR

8   839-006-0130(10); 839-006-0135(12). Arnoth has not responded to

9   this argument in her papers.

10      Additionally, DHL argues that Arnoth failed to preserve her

11  right to reinstatement by making a timely demand on the employer,

12  as required under OAR 839-006-0130(d) and 839-006-0135(b). Arnoth

13  counters that any such demand would have been futile under OAR 839-

14  006-0130(7) and OAR 839-006-0135(10), which exempt a timely demand

15  if "the employer has made it known" that reinstatement or re-

16  employment will not be considered. However, DHL points to testimony

17  from Arnoth that during her conversation with Quimby and Grudin on

18  February 13, 2008, she was told she was "more than rehirable."

19  Pltf. dep. 66:9-16. In addition, DHL points out, the written

20  severance package Arnoth received clearly stated that she was

21  eligible for rehire. Grudin Declaration, Exhibit 2. I find it

22  unnecessary to reach this argument because I conclude that DHL has

23  met its burden of showing that Arnoth was terminated for reasons

24  unrelated to her injury or her worker's compensation claim. The

25  survival of Arnoth's sex discrimination claim cannot save the

26  worker's compensation discrimination and failure to reinstate

27

28  OPINION AND ORDER Page 19

1  claims. DHL's motion for summary judgment on this claim is granted.

2  **Conclusion**

3  DHL's motion for summary judgment (doc. # 36) is GRANTED with
4  respect to Arnoth's claims for injured worker discrimination and
5  failure to reinstate, in violation of Or. Rev. Stat. §§ 659A.040,
6  659A.043, and 659A.046; DHL's motion for summary judgment is DENIED
7  with respect to Arnoth's claim for disparate treatment sex
8  discrimination under Or. Rev. Stat. 659A.030 (a) and (b).

9  IT IS SO ORDERED.

11  Dated this 2ND day of MARCH _____, 2010.

14                          Dennis James Hubel
                    United States Magistrate Judge

28  OPINION AND ORDER Page 20